UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

MARTIN GUBB,

    Plaintiff/Counter-Defendant,

v.                                                         Case number 04-72432
                                                             Honorable Julian Abele Cook, Jr.

P&M SERVICES, INC.,

    Defendant/Counter-Plaintiff.

and

P&M SERVICES, INC.,

    Plaintiff/Counter-Defendant,

v.                                                         Case number 05-71576
                                                             Honorable Julian Abele Cook, Jr.

ANDRE LAVALLEE,

    Defendant/Counter-Plaintiff.

_____

ORDER

      On July 1, 2004, Martin Gubb filed this law suit, seeking to obtain the entry of a declaratory judgment relating to his claims of (1) non-infringement and (2) the invalidity of two patents that were purportedly owned by P&M Services, Inc. (P&M). On August 6, 2004, P&M counter-claimed with allegations against Gubb of (1) a patent infringement and (2) an inducement of patent infringement. P&M also filed a separate lawsuit against Andre Lavallee for 1) patent infringement

and 2) inducing patent infringement in a federal district court in Massachusetts ("the Massachusetts action"). The Massachusetts action has been transferred to this Court and consolidated with the Gubb matter.

Gubb and Lavallee have now jointly moved for the entry of a summary judgment relating to (1) P&M's non-ownership of the patents at issue, (2) their non-liability, and (3) damages. For the reasons that are stated below, the Court grants in part and denies in part these applications for summary judgment.

I.

P&M is a corporation which provides paper-sizing services to the printing industry. Mark Wallace, the president of P&M, invented a "roll cutter" which cuts off the damaged ends of rolls of paper. In 1997, he filed a patent application with the U.S. Patent and Trademark Office for his "roll cutter" invention. Two years later, Wallace assigned all of his rights, as well as any "continuations, or divisions that may be filed with respect to the Invention[,]" in the then-pending patent application to Norkol/Fibercore, Inc.[1] During the latter part of 1999, the U.S. Patent and Trademark Office issued a "method" patent, U.S. Patent No. 5,964,024 ("'024 patent"), for the "role cutter." In 2001, Wallace was granted an "apparatus" patent, U.S. Patent No. 6,282,766 ("'766 patent"), a division of the '024 patent. He subsequently assigned his interests in the '766

---

[1] It is the contention of Gubb and Lavallee that Wallace's initial assignment occurred in 1997. Moreover, they collectively assert that the 1999 assignment by Wallace was without any legal significance because he did not own any additional rights in the patent. To support their argument, these two movants proffered a document which purports to be a 1997 assignment (Exhibit K) by Wallace. However, the Court is unable to conclusively evaluate the merits of their claims because of the extremely poor quality of Exhibit K. Notwithstanding, the assignment history of the '024 from the U.S. Patent and Trademark Office clearly shows the effective assignment year to be 1999.

patent to Fibercore Equipment Co. (a registered assumed name of P&M).[2]

In 2003, three corporations (Norkol/Fibercore, Inc., Norkol/Fibercore Holdings, Inc. and P&M) purportedly merged – with P&M emerging as the sole surviving company. As a result of this merger, all of the patents that had been assigned to Norkol/Fibercore, Inc., are now allegedly owned by P&M.[3] Using the '024 and '766 patents as a foundation, P&M asserts patent rights to a roll cutting device known as the "Papersizer."

Martin Gubb is the owner and sole shareholder of a company, commercially known as L&P Converters, Inc. (L&P), which is also in the business of salvaging damaged rolls of paper by removing the damaged ends. Gubb and Andre Lavallee, a former employee of L&P, jointly submit that, between 1998 and 1999, their company independently developed the "Precision Paper Saw" which utilized a method – similar to P&M's "Papersizer" – of removing the damaged end from of a roll of paper. Sterling Technologies, Inc. (Sterling), another company owned by Gubb, manufactured the "Precision Paper Saw."

---

[2] L&P's claim relating to the assignment of the '766 patent has been challenged by Gubb and Lavallee, both of whom collectively argue that this patent "has never been assigned." In support of their argument, they point to a document that was obtained from the U.S. Patent and Trademark Office's website, which purportedly states that the "assignment data [for '766 was] not available." Contrary to the collective contentions by Gubb and Lavallee, the Court does not interpret this phrase as reflecting the absence of an assignment. Rather, the Court reads this phrase as constituting "assignment data [for '766 which was] not available." Notwithstanding, the '766 patent clearly lists Fibercore Equipment Co. as the "assignee" and Wallace as the "inventor." *See also* Note 3, *infra.*

[3] It should be noted that, as P&M correctly points out, "to the extent that there was no valid assignment to Fibercore Equipment Company, then Norkol/Fibercore, Inc. owned the '766 patent as a result of Wallace's assignment of the '024 patent application and all divisions thereof [which included the '766 patent]. [Therefore,] [a]ll of Norkol/Fibercore, Inc.'s interest in the '766 patent was subsequently transferred to P&M as a result of the 2003 merger."

3

During the development of the "Precision Paper Saw," Lavallee was unable to resolve several operational problems, including, among other things, the speed and quality of the cuts. In April of 1998, Gubb instructed Lavallee to take a camera to the Northeast Graphics facility[4] and observe P&M's "Papersizer" in operation. Subsequent to Lavallee's visit  visit, Alex Infantino testified in his deposition that Gubb had forwarded the photographs of P&M's "Papersizer" to him, along with a request to build a comparable machine. Thereafter, Lavallee signed a patent application, in which he identified himself as the inventor of the "Precision Paper Saw." However, this patent application, which was initially denied because of P&M's pre-existing '024 patent, was subsequently amended and filed with the U.S. Patent and Trademark Office. Following its approval, the U.S. Trademark and Patent Office issued Patent No. 6,405,623 (the '623 patent) to Lavallee who, in turn, assigned it to L&P. However, P&M claims that the amendment was fraudulent because it failed to disclose that the patented design was taken from P&M's "Papersizer."

Subsequently, Gubb and his companies manufactured three machines that closely resembled P&M's "Papersizer." P&M asserts that when Gubb and his companies (1) sold one of the machines to a third-party company, Quad/Graphics, and (2) offered the other allegedly infringing machines for sale in letters to other third-party companies in the printing industry (wherein Lavallee was listed as the contact person), Gubb induced an infringement of P&M's patents.

In support of its inducement theory, P&M contends that Gubb had constructive knowledge of the '024 patent when Lavallee's initial patent application was denied by the U.S. Patent and Trademark Office. In responding to this charge, Gubb denies having the constructive knowledge

---

[4] Northeast Graphics is a Connecticut-based company from which the photographs of P&M's "Papersizer" were taken by Lavallee.

4

which has been attributed to him, maintaining that he acted only on the advice of his counsel.

As a result of the dispute between P&M, Gubb and Lavallee, several law suits ensued.[5] Particularly relevant to the pending motions is L&P's law suit in California against P&M for its infringement of the '623 patent. The California case was voluntarily dismissed with prejudice by L&P, and followed by the commencement of the litigation in this federal court. In addition, on April 21, 2005, P&M filed suit against Lavallee for (1) patent infringement and (2) inducing patent infringement in the District of Massachusetts. On June 6, 2006, the parties stipulated to transfer the Massachusetts legal proceeding to this Court for consolidation with the Gubb action.

II.

The Supreme Court has held that "[o]ne of the principle purposes of the summary judgment rule is to isolate and dispose of factually unsupportable claims or defenses[.]" *Celotex Corp. V. Catrett*, 477 U.S. 317, 323-24 (1986). At the same time, the terms of Rule 56© provide that a motion for summary judgment should be granted only if a party "show[s] that there is no genuine issue as to any material fact and that [it] is entitled to a judgment as a matter of law." Here, the burden is on Gubb and Lavallee, as the moving parties, to demonstrate the absence of a genuine

---

[5] On January 18, 2001, Norkol/Fibercore, Inc. (P&M's purported predecessor-in-interest) sued L&P and Gubb for their infringement of the '024 patent in the U.S. District Court for the Southern District of Florida. This action was dismissed due to lack of personal jurisdiction on August 20, 2001. Norkol/Fibercore filed a second patent infringement suit on December 18, 2001 in the U.S. District Court for the Eastern District of Wisconsin. This action sought to hold Gubb and L&P liable for infringing the '024 and '766 patents. On August 25, 2003, the claims against Gubb were dismissed due to lack of proper venue. However, the Wisconsin law suit proceeded against L&P and is currently stayed pending the completion of proceedings in the bankruptcy court. Finally, on October 10, 2002, L&P initiated legal proceedings in the Central District of California, alleging that Norkol/Fibercore, Inc. and P&M had infringed upon its '623 patent. L&P voluntarily dismissed this action with prejudice in August 2004, citing financial difficulties as the basis for its decision.

5

issue of a material fact. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

In assessing a request for the entry of a summary judgment, the Court must examine any pleading, deposition, answers to interrogatories, admissions, and affidavits in a light that is most favorable to the non-moving party (P&M). Fed. R. Civ. P. 56©; *see United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962); *Boyd v. Ford Motor Co.*, 948 F.2d 283, 285 (6th Cir. 1991); *Bender v. Southland Corp.*, 749 F.2d 1205, 1210-11 (6th Cir. 1984). It is not the role of the Court to weigh the facts. *See 60 Ivy Street Corp. V. Alexander*, 822 F.2d 1432, 1435-36 (6th Cir. 1987). Rather, it is the duty of the Court to determine "whether . . . there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson*, 477 U.S. at 250.

A dispute is genuine only "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* At 248. In the present case, Gubb and Lavallee can show that a genuine factual issue is lacking only if they (1) present such evidence which is sufficient to make the issue "so one-sided that [they] must prevail as a matter of law," *id*. at 252, or (2) point to the failure by P&M to present evidence that is "sufficient to establish the existence of an element essential to its case, and on which it will bear the burden of proof at trial." *Celotex Corp.*, 477 U.S. at 322. Upon such a showing, P&M must act affirmatively to avoid the entry of a summary judgment. *See* Fed. R. Civ. P. 56(e). A mere scintilla of supporting evidence is insufficient. *See Anderson*, 477 U.S. at 252, *quoted in Street v. J.C. Bradford & co.*, 886 F.2d 1472 (6th Cir. 1989). Indeed, "[i]f the evidence is merely colorable or is not significantly probative summary judgment may be granted." *Anderson*, 477 U.S. at 249-50 (citations omitted).

Applying this standard, the issue becomes whether there is a genuine issue of a material fact

6

which can be applied to such issues as (1) P&M's ownership of the '024 and '766 patent, (2) the personal liability of Gubb and Lavallee, and (3) damages, including lost profits and attorney's fees relating to the California lawsuit.

### III.

In their first motion for summary judgment, Gubb and Lavallee allege that P&M has failed to produce crucial merger documents that would establish its ownership of the challenged patent. They also note that "[a] *patentee* shall have remedy by civil action for infringement of his patent." 35 U.S.C. § 281 (emphasis added). In its interpretation of this statute, the Federal Circuit Court of Appeals declared in *Minco, Inc. v. Combustion Engineering, Inc.* that "[u]nder the Patent Act, *only patentees* can bring an action for infringement. *See* 35 U.S.C. § 281 (1994). Patentees include not only the one to whom the patent issued but also any successors in title. 35 U.S.C. § 100(d) (1994)." 95 F.3d 1109, 1116 (Fed. Cir. 1996) (emphasis added). Patents can only be assigned by written instruments. 35 U.S.C. § 261; *Gaia Tech. v. Reconversion Tech.*, 93 F.3d 774, 777 (Fed. Cir. 1996).

Although Gubb and Lavallee have contended that P&M has failed to produce merger documents which would establish its ownership of the '024 and '766 patents, P&M, in its response brief, has acted affirmatively by producing documents which facially undercut the movants' position on this issue.[6] Thus, acceptance of these documents by the Court for the singular purpose of this motion constitutes a sufficient basis upon which to reject the application of Gubb and

---

[6] Contrary to Gubb and Lavallee's contention, the Court finds no clear, flagrant abuse that would warrant an exclusion of the proposed merger documents.

Lavallee for the entry of a summary judgment on the basis of the current record.[7]

IV.

In their second motion for summary judgment, Gubb and Lavallee argue that they cannot be held liable for the claimed patent infringement or the inducement of a patent infringement. 35 U.S.C. § 271(a) provides that "[w]hoever without authority makes, uses or sells any patented invention, within the United States during the term of the patent therefor, infringes the patent." In *Manville Sales Corp. v. Paramount Systems, Inc.*, the Federal Circuit Court held that "[f]or officers of [a corporation] . . . to be personally liable for [their company's patent] infringement[,] . . . there must be evidence to justify piercing the corporate veil." 917 F.2d 544, 552 (Fed. Cir. 1990).[8]   The *Manville* court held that "a court may . . . pierc[e] the corporate veil [if it] will prevent fraud, illegality, injustice, or a contravention of public policy, or prevent the corporation from shielding someone from criminal liability."[9] *Id.* Stated in another way, "unless there is at least

---

[7] In their Reply Brief, Gubb and Lavallee argue that "[t]he merger documents do not explicitly convey the right to sue for past infringement. . . . Without the right to sue for past infringement, the assignee of the patent lacks standing to sue for infringement that occurred prior to the assignment." (citation omitted). While Gubb and Lavallee have produced case law to support this principle, it is irrelevant to the facts of this case; namely, that P&M ostensibly obtained its patent rights by *merger*, not by an assignment.

[8] P&M contends that "[t]here is a conflict in the decisions of the Federal Circuit on this issue [of piercing the corporate veil and that] *Manville* has been criticized by other courts, and should not be followed by this Court[.]" However, P&M supports this claim with district court decisions, none of which are binding upon the Court.

[9] It should be noted that Gubb and Lavallee contend that "[w]hen evaluating whether to pierce the corporate veil, the Federal Circuit looks to state law." To support this proposition, they cite *Semiconductor Energy Lab. Co. Ltd. v. Samsung Elec. Amer., Inc. et al.*, 116 F.3d 1497 (Fed. Cir. 1997) (unpublished opinion). However, upon a closer evaluation of *Semiconductor* and other relevant case law, it is clear that the Federal Circuit common law – not the state law of incorporation – provides the standard for piercing the corporate veil relating to patent

specific intent to escape liability for a specific tort[,] . . . the cause of justice does not require disregarding the corporate entity." *Id.* "Thus when a *person in a control position* causes the corporation to commit a civil wrong, imposition of personal liability requires consideration of the nature of the wrong, the culpability of the act, and whether the person acted in his/her personal interest or that of the corporation." *Hoover Group, Inc. v. Custom Metalcraft, Inc.*, 84 F.3d 1408, 1411 (Fed. Cir. 1996) (emphasis added).

Gubb, as the sole shareholder and owner of L&P, is in a control position, as that term is used in *Hoover*. Viewing the facts in a light most favorable to P&M, it appears that Gubb – after directing Lavallee and Infantino to copy the "Papersizer"– sold it to Quad Graphics. P&M also points to Gubb's deposition testimony, in which he opined that such an infringement, if any, would be only a matter of paying royalties. Thus, the Court believes that there is a genuine issue of a material fact as to whether (1) Gubb had the requisite intent to infringe, (2) the corporate veil may be pierced, and (3) he can be held liable for patent infringement.

Similarly, and when examining the facts in a light that is most favorable to P&M, it appears that Lavallee took photographs of the "Papersizer," helped build and manufacture the allegedly infringing machine, and applied for a patent on two separate occasions with knowledge of P&M's patent. Therefore, the Court believes that there is a genuine issue of a material fact as to whether

---

infringement claims. *See id.* at *2 – *4 (referring to Fourth Circuit Court common law, which in turn refers to state law of incorporation, regarding piercing corporate veil where "the issues . . . are *not unique to patent law*" (emphasis added)); *see also In re Cambridge Biotech Corp.*, 186 F.3d 1356, 1368 (Fed. Cir. 1999) ("In reviewing district court judgments . . ., we apply our own law with respect to issues of substantive patent law and certain procedural issues pertaining to patent law, but as to nonpatent issues, we apply the law of the circuit in which the district court sits."); *id.* at 1375-76 (applying state of incorporation law with respect to piercing corporate veil of a non-patent issue (i.e., remedy for breach of contract)).

Lavallee, though not a corporate officer, (1) was in "a control position" and (2) had the requisite intent for an act of infringement which would justify a piercing of the corporate veil.[10] Accordingly, the entry of a summary judgment as it applies to Gubb and Lavallee's non-liability is denied.

Gubb and Lavallee also seek a summary judgment as to P&M's claim for its inducement of patent infringement. 35 U.S.C. § 271(b) provides that "[w]hoever *actively induces* infringement of a patent shall be liable as an infringer." (emphasis added). Unlike *direct* infringement claims, the corporate veil need not be pierced to hold a corporate officer personally liable for *inducing* patent infringement.[11] *See Hoover Group, Inc. v. Custom Metal Craft, Inc.*, 84 F.3d 1408, 1412 (Fed. Cir. 1996). Rather, "the officer must have possessed specific intent to aid and abet infringement." *Id.* "[L]egal advice is only one factor to be considered, and an opinion of counsel does not guarantee against a finding of willfulness . . . ." *Minnesota Mining & Mfg. Co. v. Johnson & Johnson Orthopaedics, Inc.*, 976 F.2d 1559, 1580 (Fed. Cir. 1992).

The evidence in this case, when viewed in a light that is most favorable to P&M, establishes the existence of a genuine issue of a material fact as to the liability of Gubb and Lavallee on this issue. On the basis of the current record, it appears that Lavallee and Infantino jointly complied

---

[10] Lavallee claims that he only acted within the limits and scope of his employment. However, P&M disagrees and has offered some evidence to support its contention. Lavallee's assertion alone, when viewed in a light that is most favorable to P&M, is insufficient to satisfy the requirements for summary judgment.

[11] It should be noted that although there is no need to pierce the corporate veil when evaluating the inducement of patent infringement claims, it is evident that many of the same facts which support piercing the corporate veil contention also provide a foundation for making a claim of inducing patent infringement.

10

with Gubb's directive to build and manufacture the allegedly infringing machine. There is also evidence that Lavallee applied for the '623 patent. Hence, there is a genuine issue of a material fact as to what extent Gubb and Lavallee actively participated in the sales of the allegedly infringing machine. Although Gubb claims to have acted only upon the advice of his counsel, this is only one factor to consider when seeking to determine if he intended to induce an infringement of the patent. *See id.* Therefore, the Court concludes that there is a genuine issue of a material fact as to whether either or both of them had the specific intent to aid and abet in patent infringement.[12] Accordingly, Gubb and Lavallee's motion for summary judgement regarding their non-liability for inducement of patent infringement is also denied.

V.

In their third and final application for a summary judgment, Gubb and Lavallee claim that P&M (1) is only entitled to damages in the amount of a reasonable royalty for any infringement that may have occurred because there were "acceptable substitutes" on the market, (2) cannot recover attorney's fees from the California law suit, and (3) is not entitled to consequential damages that resulted from the litigation in California, which allegedly caused it to heavily invest in the development of non-infringing alternatives to the '623 patent.

---

[12] In a footnote to his brief and during the oral arguments, Lavallee contended that "[u]nder the theory enunciated by P&M, the floodgates to litigation would open and wreak havoc on corporate America. By way of example, under P&M's theory, a company like General Motors would be paralyzed by a lawsuit for patent infringement because its line workers would be susceptible to lawsuits for inducing General Motors to infringe by virtue of their work on the line." The Court rejects this analogy because there is a genuine issue of a material fact as to whether Lavallee was in a position of "control or authority," notwithstanding his title as a "mere employee." Accordingly and after viewing the facts in a light which is most favorable to P&M, it can hardly be said that Lavallee was a "line worker" by any standard.

A patentee, whose patent has been infringed, is entitled to damages that are "adequate to compensate for the infringement, but in no event less than a reasonable royalty for the use made of the invention by the infringer." U.S.C. § 284. "Damages may include lost profits due to diverted sales, price erosion, and increased expenditures caused by the infringement." *Herbert v. Lisle Corp.,* 99 F.3d 1109, 1119 (Fed. Cir. 1996). Under such circumstances, an injured party must prove that "but for the infringement, the patent owner would have made the sales that the infringer made, charged higher prices, or incurred lower expenses." *Lam, Inc. V. Johns-Manville Corp.,* 718 F.2d 1056, 1065 (Fed. Cir. 1983). In *Panduit Corp. v. Stahlin Bros. Fibre Works, Inc.*, the Sixth Circuit Court held:

> To obtain as damages the profits on sales he would have made absent the infringement, i.e., the sales made by the infringer, a patent owner must prove: (1) demand for the patented product, (2) *absence of acceptable noninfringing substitutes*, (3) his manufacturing and marketing capability to exploit the demand, and (4) the amount of the profit he would have made.

575 F.2d 1152, 1156 (6th Cir. 1978) (emphasis added).

Of significance, a patentee cannot recover lost profits unless he has established all of the four *Panduit* factors. *See Smith Kline Diagnostics, Inc. v. Helena Labs*., 926 F.2d 1161, 1165 (Fed. Cir. 1991). With respect to the "absence of *acceptable* non-infringing substitutes" requirement from *Panduit*, the Federal Circuit has stated that "the mere existence of a competing device does not necessarily make that device an *acceptable* substitute." *Standard Havens Products, Inc. v. Gencor Industries*, 953 F.2d 1360, 1373 (Fed. Cir. 1991) *cert. denied* 113 S. Ct. 60 (1992) (emphasis added). "A product on the market which lacks the advantages of the patented product can hardly be termed a substitute acceptable to the customer who wants those advantages." *Id.*

Relying exclusively upon Wallace's deposition testimony, Gubb and Lavallee contend

that "because P&M admits that there were suitable, non-infringing substitutes to P&M's patented method and apparatus, it cannot recover lost profits." Contrary to this characterization by Gubb and Lavallee, the Court does not read Wallace's deposition testimony as constituting an "admission" regarding the existence of an acceptable substitute.[13] Notwithstanding, the Court concludes that, when viewing the facts in a light most favorable to P&M, there are noted differences between P&M's "Papersizer" and the alternatives that were presumably available to the public at the time of the alleged infringement.[14] Therefore, whether there was an acceptable substitute during the alleged infringement is a question of a material fact which must be answered by the jury. As a result, Gubb and Lavallee's motion for summary judgment as to whether P&M may recover lost profits must be, and is, denied.

P&M also seeks consequential damages that were allegedly sustained during its defense

---

[13] To support their position, Gubb and Lavallee rely upon the following deposition exchange with Wallace: *Question*: "Each of the machines that you just listed [including the slitter rewinder], are they in use by companies that provide the same service that P&M Services provides with respect to its paper sizer services?" *Answer*: "Yes, sir." *Question*: "Does the use of a slitter rewinder [a purported acceptable substitute] infringe the '024 patent?" *Answer:* "Not that I'm aware of, no, sir." *Question:* "Does a slitter rewinder machine itself infringe the '766 patent?" *Answer:*"Not that I'm aware of."

The Court reads Wallace's responses as merely stating that he was not "aware of"any infringement – not that the slitter rewinder did not infringe the '024 and '766 patents. Notwithstanding, this exchange does not establish that the slitter rewinder was an "acceptable" substitute. Rather, it only indicates that it was "in use by companies that provide the same services that P&M Services provides with respect to its paper sizer services[.]"

[14] For example, P&M states that "the Papersizer has definite advantages over all other methods of cutting paper – it is much faster and produces a better end product. No other machine can take a damaged roll of paper, cut the damaged end off the roll, and make it ready to use on a printing press ("press ready") with the same speed or quality. Furthermore, the Papersizer is mobile, which reduces time, transportation costs and reduced transportation damage to the rolls of paper."

13

against the claims of L&P in California. More specifically, P&M claims that it incurred additional costs by developing non-infringing technology during the pendency of the California litigation in an effort to avoid an infringement of the '623 patent if it was found to be valid. Foremost, it is noteworthy that only L&P – not Gubb or Lavallee – was the named plaintiff in the California action. However, the Court believes that there is a genuine issue of a material fact as to whether Gubb and Lavallee may be held liable for L&P's allegedly fraudulent enforcement of its '623 patent. Nonetheless, as Gubb and Lavallee have pointed out, the plain language of 35 U.S.C. § 284 provides that "[u]pon finding for the claimant [in a patent infringement case,] the court shall award the claimant damages adequate to compensate for the *infringement* . . . together with interest and *costs* as fixed by the court." (emphasis added). P&M has not proffered any legal authority which establishes that the mere filing of a lawsuit to enforce an allegedly fraudulently-obtained patent (i.e., L&P's '623 patent) constitutes an "infringement," or, notwithstanding, that voluntarily-incurred expenses which were undertaken to avoid any potential infringement constitutes "costs," as covered by § 284's plain language.[15] Accordingly, the motion for summary judgment by Gubb and Lavallee regarding consequential damages from the California litigation must be, and is, granted.

Finally, Gubb and Lavallee contend that P&M cannot recover the attorney's fees that it

---

[15] P&M asserts that, in *Lam, Inc. v. Johns-Manville Corp.*, 718 F.2d 1056 (Fed. Cir. 1983), the Federal Circuit awarded damages which accounted for the "significant time and money spent on the patent infringement lawsuit." P&M's Response at 11. However, the Court does not read *Lam* so broadly as to include the expenses which were incurred by P&M in "develop[ing] a new technology that would allow P&M to operate free from the threat posed by the fraudulently-obtained '623 patent." *Id.* at 3.

14

incurred in connection with the California law suit.[16] It should be noted that, when L&P's complaint was dismissed with prejudice, the federal district court in California declined P&M's request to obtain attorney's fees from L&P. This Court sees no reason to disrupt that ruling. *See Smoot v. Fox*, 353 F.2d 830, 833 (6th Cir. 1965) ("[a] dismissal with prejudice . . . finally terminates the cause and the defendant cannot be made to defend again. [Therefore], attorney's fees are not proper where the dismissal is with prejudice."). Moreover, other than their connection with L&P, P&M has not proffered any reason to hold Gubb or Lavallee responsible for the attorney's fees that were incurred in connection with the California litigation. Therefore, P&M cannot indirectly obtain attorney's fees from Gubb or Lavallee in this Court when it could not directly recover those same attorney's fees from L&P in California. Accordingly, Gubb and Lavallee's motion for summary judgment regarding the attorney's fees from the California action must be, and is, granted.

VI.

Having considered the parties' arguments, the evidence, and the applicable standards, the Court (1) denies the "Motion for Summary Judgment as to P&M's Non-Ownership of the Patents-in-Suit," as well as the "Motion for Summary Judgment of No Liability," both of which had been filed by Gubb and Lavallee, and (2) grants in part and denies in part their "Motion for Partial Summary Judgment as to Damages" for the reasons that have been set forth above.

IT IS SO ORDERED.

---

[16] 35 U.S.C. § 285 provides that "[t]he court in exceptional cases may award reasonable attorney fees to the prevailing party." However, P&M seeks to recover the attorney's fees that it incurred in connection with a separate matter (i.e., the California action), not the pending matter before this Court. Therefore, for the purpose of P&M's request for attorney's fees stemming the law suit in California, 35 U.S.C. § 285 is irrelevant.

Dated: September 1, 2006           s/ Julian Abele Cook, Jr.
    Detroit, Michigan          JULIAN ABELE COOK, JR.
         United States District Court Judge

Certificate of Service

I hereby certify that on September 1, 2006, I electronically filed the foregoing with the Clerk of the Court using the ECF system, and I further certify that I mailed a copy to the non-ECF participant(s).

         s/ Kay Alford
         Courtroom Deputy Clerk